# EXHIBIT A

Page 1

1                    H. Vaccaro

2             UNITED STATES DISTRICT COURT

3             CENTRAL DISTRICT OF NEW YORK

4                   CENTRAL DIVISION

5      ------------------------------

       JOHN BRANCA AND JOHN MCCLAIN, )          **CERTIFIED COPY**

6      Executors of the Estate of    )

       Michael J. Jackson, et al.,   )

7                                    )Case No. CV-11-584 DDP (PJWx)

                Plaintiffs,          )

8                                    )

9             v.                     )

                                     )

       HOWARD MANN, an individual,   )

10     et al.,                       )

                                     )

11              Defendants.          )

       ------------------------------

12

13              VIDEOTAPED DEPOSITION

14                     OF

15            HENRY V. VACCARO, SR.

16            New York, New York

17          Tuesday, March 21, 2012

18

19

20

21

22

23     Reported by:

24     ANNETTE ARLEQUIN, CCR, RPR

25     JOB NO. 47483

1                         H. Vaccaro

2              Do you understand that?

3         A.    Understand.

4              I just have one question.  Just speak

5    loud because my hearing in my later years has

6    diminished and I'm too vain to get a hearing

7    aid.

8         Q.    Okay.  I will try to speak loud and

9    slow for our court reporter because I speak very

10   quickly.

11        A.    Okay.

12        Q.    Also for our court reporter, it's

13   difficult or impossible for her to take down

14   when two of us are speaking at the same time, so

15   I'm going to ask that even though you may know

16   what my question is going to be when I'm halfway

17   through it, that you wait until I've completed

18   my question before you answer.

19              Will you do that?

20        A.    I will do that.

21        Q.    I will also try and wait until you've

22   completed your answer before I begin my next

23   question, all right?

24        A.    Great.

25        Q.    You are here testifying both in your

1                         H. Vaccaro

2    individual capacity and as well as the capacity

3    of the person most knowledgeable for a company

4    called Vintage Associates LLC.

5              You understand that?

6         A.    Yes, that's correct.

7         Q.    And you are one of the principals of

8    Vintage Associates LLC, are you not?

9         A.    Yes.  I'm the managing member.

10        Q.    Okay.  Where were you born,

11   Mr. Vaccaro?

12        A.    In Neptune, New Jersey at Jersey

13   Shore Medical Center.

14        Q.    Have you lived in New Jersey your

15   entire life?

16        A.    Yes, I have.

17        Q.    Where did you go to high school?

18        A.    Asbury Park High School.

19        Q.    What year did you graduate?

20        A.    1958.

21        Q.    Did you have any formal education

22   after you graduated high school?

23        A.    A year-and-a-half of college at

24   Villanova and I left college when my father

25   passed away.

H. Vaccaro

2      Fair enough?

3   A.    I understand.

4      So it was my best estimate that the

5   year was '83, '84.

6      MR. RANDO:  Thank you, Counsel.

7      MR. MODABBER:  Huh?

8      MR. RANDO:  I said "Thank you,

9   Counsel."

10      MR. MODABBER:  Sure.

11   BY MR. MODABBER:

12   Q.    At some point in your life at Kramer

13   Guitar Company, did you meet one or more members

14   of the Jackson family?

15      And by the Jackson family, I'm going

16   to refer to, the most famous one is Michael

17   Jackson's family, including his parents or

18   siblings or...

19   A.    The only member of the family I met

20   during my tenure at Kramer Guitar was Tito

21   Jackson because we made a custom guitar for

22   Tito.

23   Q.    Do you recall what year that was?

24   A.    No.

25   Q.    Do you recall whether at some point

1                         H. Vaccaro

2    you became involved in some business dealings

3    with one or more members of the Jackson family?

4         A.    Yes.

5         Q.    Do you recall approximately what year

6    that was?

7         A.    Approximately -- well, I'd have to

8    expand on it.  The direct business deal

9    relationship was in 1991.

10             However, I had met them in 1988 when

11   I paid for Joseph and Katherine Jackson to come

12   to Asbury Park, New Jersey because they wanted

13   the get involved in a major redevelopment

14   project that I was a partner in.

15        Q.    Okay.  So let's start in 1988.

16             You had already met Tito by this

17   point, correct?

18        A.    Yes.

19        Q.    And you said that Katherine and

20   Joseph, who were the parents of Michael

21   Jackson --

22        A.    Yes.

23        Q.    -- came to Asbury Park?

24        A.    Yes.

25        Q.    What was the business proposal that

H. Vaccaro

1

2 we're talking about that, is that the hearings

3 were held in camera as they didn't want to

4 discuss all of Jackson private business for the

5 public.

6     Q.    And these are hearings before the

7 bankruptcy judge.

8     A.    Correct.

9     Q.    Where was that bank -- I'm sorry.

10     Were you finished with your answer?

11     A.    Yes.

12     Q.    Where was that bankruptcy proceeding?

13     A.    In Trenton, New Jersey.

14     Q.    Okay.  At some point you get involved

15 with litiga -- in litigation with Jackson

16 communications and/or one or more members of the

17 family; is that right?

18     A.    Yes.

19     Q.    Do you recall approximately how long

20 after the plan of reorganization they had agreed

21 to fund was put in place?

22     A.    It was after that when they failed to

23 pay accordance with the plan of reorganization

24 that they signed.  I believe they made the first

25 payment of around $200,000.  The judge gave them

1                         H. Vaccaro

2    selling everything and whatever money we get

3    we're going to use to pay all the debt that we

4    owe.

5         A.     Absolutely.

6         Q.     All right.  So HVV Corporation went

7    from a Chapter 11 to a Chapter 7 and when that

8    happened, Kramer Guitar Company was sold.

9         A.     Sold off.

10        Q.     All right.  And it was sold off for

11   an amount less than an amount necessary to pay

12   all of your creditors?

13        A.     Correct.

14        Q.     And as a result of that, did you get

15   into litigation with the Jackson?

16        A.     Yes.  I filed suit against Jackson

17   Communications for fraud.  I don't want to say

18   I.  HVV Corp. filed suit against Jackson

19   Communications in bankruptcy court for I believe

20   specific performance as well, because I was

21   personally to get a consulting contract and a

22   royalty for this new invention that I had a

23   patent on as part of the transaction, so when it

24   failed to materialize, HVV Corp. filed suit.

25        Q.     Were there any other plaintiffs in

1                         H. Vaccaro

2     that lawsuit other than HVV Corporation?

3          A.    No.

4          Q.    And this was an adversary proceeding

5     in the bankruptcy court, correct?

6          A.    Yes.

7          Q.    Do you recall who all of the

8     defendants were in that adversary proceeding?

9          A.    Yes.

10         Q.    Who were they?

11         A.    They were Katherine and Joseph,

12    Tito -- Mr. and Mrs. Jackson, Tito, Randy,

13    Rebbie, Marlon, Jackie, Jermaine, Michael,

14    Janet, La Toya.

15         Q.    And ultimately did you obtain a

16    judgment in that adversary proceeding?

17         A.    I did.  HVV did.

18         Q.    HVV did.

19               And against whom was that judgment?

20         A.    It was again the entire family.

21               However, Michael and Janet got out of

22    the lawsuit.

23         Q.    So the judgment is against all of the

24    Jackson family members you mentioned except

25    Michael and Janet.

Page 30

1                          H. Vaccaro

2        A.     And La Toya.

3        Q.     And La Toya.

4        A.     That's correct.

5        Q.     Okay.  How much was the judgment for?

6        A.     Approximately $1.45 million.

7        Q.     When you had that judgment, did you

8   begin to take steps to execute on the judgment,

9   collect on it?

10       A.     Yes.

11       Q.     And again, we are still in the

12  bankruptcy proceeding, right?

13       A.     Yes.

14       Q.     All right.  So within that

15  bankruptcy, efforts are made to collect the

16  $1.45 million judgment.

17              Do you recall who was making those

18  efforts?

19              In other words, was there a trustee

20  or who was acting then?

21       A.     No.   I got permission from the

22  trustee to engage a collection attorney in

23  California and I don't recall the first

24  collection attorney's name, but I can get it for

25  you.  And now we're in a time frame

Page 31

H. Vaccaro

1
2    approximately 1998, approximately.

3         The attorney's name was Kary Kump,

4    Kump.

5         Q.    And Mr. Kump goes out and tries to

6    find assets that belong to the Jackson family

7    members against whom you had a judgment,

8    correct?

9         A.    No, not at first.

10        Q.    Okay.  What did I get wrong?

11        A.    The first thing he did was took the

12   debtors' exam of Katherine and Joseph to

13   determine where their assets were.

14        Q.    After that, what did he do?

15        A.    Then -- he eventually did nothing.

16   That's why I got another attorney.

17        Q.    Who did you hire after Mr. Kump?

18        A.    Steven Fernandez and Frank Kunis.

19   Kunis is an investigator, Steven Fernandez is an

20   attorney.

21        Q.    And as a result of Mr. Fernandez and

22   Mr. Kunis' efforts, did you ultimately find some

23   assets to satisfy your judgment?

24        A.    Yes, we did.

25        Q.    What did you find?

1                     H. Vaccaro

2        A.     The first thing, they found that both

3    Katherine and Joseph had lied and they seized

4    two Rolls Royce automobiles out of Katherine

5    Jackson's garage and they seized a piano that

6    was allegedly that Michael wrote the Thriller

7    album on out of Mrs. Jackson's living room,

8    because she appeared on a television show and

9    she said Michael gave it to her as a gift.  As a

10   result of that, they got an ex parte application

11   for a seizure.

12       Q.     So the first assets that you found to

13   satisfy your judgment were these two cars and

14   the piano?

15       A.     That is correct.

16       Q.     And what did you do with those items

17   when you got them?

18       A.     Well, the lawyers had them.

19       Q.     Okay.

20       A.     The first thing, they were going to

21   sell them, but before they could sell them, the

22   other assets were found and then the family

23   filed bankruptcy.

24       Q.     All right.  What were the other

25   assets that were found before the family filed

Page 33

1                        H. Vaccaro

2    bankruptcy?

3        A.    A warehouse full of memorabilia in

4    Oxnard, California.

5        Q.    Can you generally describe what was

6    in that warehouse?

7        A.    Yes.

8        Q.    Please do.

9        A.    A complete family collection that

10   they had been collecting for 25 years or longer

11   of gold records, stage costumes, photographs,

12   recording tapes, slides, anything you can think

13   of that belonged to this family because they had

14   intended to do a restaurant chain to be

15   patterned after the Hard Rock.  And that was

16   disclosed to me in I believe 1993 when I was at

17   the family compound in Encino for a three-day or

18   four-day work session dealing with the entities

19   of the family, the business plan of the family.

20       Q.    Okay.  To try and get a handle on

21   what we're talking about in terms of this

22   memorabilia and all these items you described,

23   if you would open the binder I've put next to

24   you there and take a look at Tab 27, which is

25   Exhibit 57 marked in a previous deposition.

Page 34

1              H. Vaccaro

2              And in particular --

3      A.      Hold on.

4      Q.      Okay.

5      A.      Exhibit 27?

6      Q.      Exhibit 57.

7      A.      Okay.  I have that.

8      Q.      Tab 57 and I'm going to take you to

9   the page numbered VPM 0014.

10             MR. POULOS:  What page?

11             MR. MODABBER:  Fourteen.

12             For the record, I'll refer -- I'll

13         identify Exhibit 57 as what's been referred

14         to as the Structured Management Agreement.

15         It's between -- the parties to the

16         agreement are Mr. Mann, Mr. Vaccaro and

17         Vintage Associates LLC.

18   BY MR. MODABBER:

19      Q.      And attached to this agreement are

20   some appendices and I'm showing you the first

21   appendix, which is identified as the

22   Vaccaro-Jackson memorabilia collection, and what

23   I want to do, Mr. Vaccaro, is ask you to take as

24   much time as you need and go through this

25   appendix, and the next one, there's an Appendix

```
1                         H. Vaccaro

2   2 that I believe actually relates to the

3   recordings, and tell me whether this represents

4   the inventory that you seized or found in

5   Oxnard.

6                 MR. POULOS:  You want him to look at

7         page 14 through 71?

8                 MR. MODABBER:  Fourteen through

9         seventy-one.

10      A.      This is part of it.

11      Q.      Okay.  What is missing from that?

12              I'm sorry.  Let me back up.

13              Did you prepare Appendices 1 and 2

14  that we just looked at?

15      A.      Yes.  I didn't personally, my son

16  did, but it was done in my office.

17      Q.      And under your direction?

18      A.      Yes, because I like to...

19      Q.      All right.  Do you know how he went

20  about preparing this inventory?

21      A.      Yes.

22      Q.      How did he do that?

23      A.      We had a master inventory list of

24  everything that was seized at the time and that

25  list, less the items that were sold at auction,
```

Page 36

H. Vaccaro

1  made this list up.

2  MR. RANDO:  I just want to clarify on

3  the record, I'd like the witness to be able

4  to review it carefully because we referred

5  to this as this was made up and that was --

6  I just want to make sure -- I'm not sure,

7  you know...

8  MR. MODABBER:  He can do it.

9  BY MR. MODABBER:

10  Q.  Go ahead and review.  Take all the

11  time you need, Mr. Vaccaro.

12  A.  I don't need any time.  This thing

13  is a -- we had a master list.  Some of the items

14  were sold at auction, so from the master list

15  you cross off the items that were sold and now

16  you have a new list.

17  Q.  Okay.  And that's what Exhibit or

18  Appendices 1 and 2 to Exhibit 57 are.

19  A.  Yes.

20  Q.  Do you have the original inventory in

21  your possession?

22  A.  Not with me.  Somewhere we have it in

23  the office, yes.

24  Q.  Okay.  Maybe we can talk off the

Page 43

1                          H. Vaccaro

2        Q.     At May --

3        A.     At Mayflower, yes.

4        Q.     At Mayflower.

5               And you're referring to Exhibit 80

6    there.

7        A.     Exhibit 80, yes.

8        Q.     Perfect.  I'll take those back.

9               (Handing.)

10       Q.     All right.  What happened, if you

11   know, to the property that was not taken by the

12   marshal?

13       A.     It became property of El-Rich as a

14   result of the 363 bankruptcy auction.

15       Q.     We'll get there later.  I just wanted

16   to make sure it was now out of the picture.

17              So now going back to what I showed

18   you before, which are Appendices 1 and 2 of

19   Exhibit 57 --

20       A.     Yes.

21       Q.     -- these inventories, including the

22   recordings and the memorabilia stuff, do you

23   know whether these include only what was taken

24   by the marshal or does it include something more

25   than that?

1                        H. Vaccaro

2        A.    There was nothing other than what

3    was -- well, excuse me.   It includes from both

4    warehouses globally because the bankruptcy

5    debtor was Tito Jackson and the warehouse was

6    under his rent and control, and under the name

7    of Jackson -- it was Tito Jackson slash another

8    name.   Jackson Entertainment or something like

9    that.   I have that name for you.

10       Q.    All right.   So to make sure I've got

11   this straight, Appendices 1 and 2 are in fact

12   inventories of everything that was found in that

13   storage facility minus things that were sold in

14   an auction sometime later.

15       A.    Yes.

16       Q.    Correct?

17       A.    And it might be...  Yes, and also

18   there were some items that were eventually

19   stolen from a warehouse in Las Vegas that might

20   be on here, but subsequently were found to be

21   stolen.   So, in other words, this came from a

22   master list and at that time we didn't know the

23   stuff had been stolen.

24       Q.    Then you mentioned that there was

25   also another inventory that you did not bring

1          H. Vaccaro

2     that.

3          Q.    All right.

4          MR. RANDO:  Just so I understand,

5     counsel's question is whether the two Rolls

6     Royces and the piano are inventory on these

7     Exhibit 79 and 80?

8          MR. DURST:  Yes.

9          A.    No, absolutely not.

10         Q.    Let's -- at some point you said the

11    Jacksons filed bankruptcy and your collection

12    efforts ended?

13         A.    Yes.  They ended up filing a Chapter

14    7 and everything had to be turned over to them

15    per an order.  Because it happened within 90

16    days from the date of the bankruptcy, it

17    belonged to property in the bankruptcy estate

18    and not to one single creditor.

19         Q.    Before I get into the details of this

20    day and what happened there, you referred to an

21    auction where some of the property was sold.

22         A.    Yes.

23         Q.    Did that auction take place before or

24    after the Jacksons filed bankruptcy?

25         A.    I initially thought it took place

H. Vaccaro

1
2  before, but it had to have taken place after and

3  the only reason I can say that is the letter

4  that I reviewed last night from Lavely & Singer,

5  which was Michael's attorney, said that the

6  court had determined that the property belonged

7  to the estate and not Michael Jackson, and

8  therefore if you sell it and use his name, we're

9  going to sue you.  So I can only presume that it

10  happened after the bankruptcy because there was

11  no estate prior to that.

12      Q.    All right.  Which members of the

13  Jackson family filed bankruptcy as far as you

14  know?

15      A.    Katherine and Joseph, Tito, Jermaine,

16  Randy, and Marlon and Rebbie.

17      Q.    Not Michael, correct?

18      A.    No.

19      Q.    Not Janet, correct?

20      A.    No.

21      Q.    By the way, when you say no -- let me

22  do this over.

23          Was Michael Jackson one of the

24  Jackson family members who filed bankruptcy?

25      A.    No.

1                    H. Vaccaro

2              MR. POULOS:  Object to form.

3     BY MR. MODABBER:

4         Q.    Was he --

5              MR. POULOS:  I have an objection to

6         form.  I don't know if he knows or...

7              THE WITNESS:  If he didn't, I would

8         know who filed because I had a judgment.

9     BY MR. MODABBER:

10        Q.    To your knowledge, was Michael

11    Jackson one of the Jackson family members who

12    filed bankruptcy?

13        A.    No.

14        Q.    To your knowledge, was Janet Jackson

15    one of the Jackson family members --

16        A.    No.

17        Q.    -- who filed bankruptcy?

18        A.    No.

19        Q.    Let's all slow down a little bit.

20              To your knowledge, was La Toya

21    Jackson one of the Jackson family members who

22    filed bankruptcy?

23        A.    Not at this time.  I think she had a

24    separate bankruptcy, but it was not at this

25    point in time.

H. Vaccaro

1

2      Q.     To your knowledge, Michael Jackson

3  never filed bankruptcy.

4      A.     I don't know.

5      Q.     To your knowledge?

6      A.     No.

7      Q.     All right.  When the Jacksons filed

8  bankruptcy, what happened to the inventory that

9  had been seized by the marshal?

10     A.     It was taken over by the bankruptcy

11 trustee.

12     Q.     Do you remember the name of that

13 trustee?

14     A.     Byron Moldo maybe.

15     Q.     Did Mr. Moldo also take control of

16 the other portion of the inventory that had not

17 been removed by the marshal?

18     A.     Yes.  And now that I recall --

19            MR. POULOS:  I object to form.

20 BY MR. MODABBER:

21     Q.     And again, I'm asking you if you

22 know.

23     A.     Yes, he did and he also, now that you

24 recall because I mentioned the name, the Rolls

25 Royce and the piano were also sold under his

Page 51

                          H. Vaccaro

1

2  tutelage, so it had to be at that time frame.

3      Q.    Do you know whether any of that

4  inventory was moved during the period that the

5  Jacksons were in bankruptcy?

6      A.    I don't know.

7      Q.    Do you recall what year the Jacksons

8  filed bankruptcy and stopped your collection

9  efforts?

10     A.    Approximately 1999 or it could have

11 been late '98, but it was around '99.

12     Q.    Do you know a lawyer named Ed Pease?

13     A.    Yes.

14     Q.    How did you first meet Mr. Pease?

15     A.    He was engaged by Mr. Fernandez, who

16 was my collection attorney.  I never met Ed

17 Pease initially.  I met him later.

18     Q.    So Mr. Pease was your lawyer.

19     A.    Yes, through Fernandez.  He was like

20 a consultant in a construction case.  He was a

21 consultant to Mr. Fernandez, so I don't know

22 whether he -- directly he's HVV's lawyer or he's

23 a consultant for Fernandez, but that's how he

24 got into the picture.

25     Q.    When you originally obtained

Page 58

                         H. Vaccaro

1

2   That's the first time I saw it and that's all I

3   ever saw until the bankruptcy trustee's auction.

4       Q.    All right.  The auction that you

5   spoke about, not the bankruptcy trustee auction,

6   the auction where some of the items were sold,

7   was that before or after El-Rich purchased?

8       A.    It was way after.

9       Q.    Okay.

10      A.    It was in 2007.

11      Q.    Perfect.

12            All right.  So let's go back now to

13  roughly 2002.  We're in bankruptcy, there's a

14  stay over any enforcement of your judgment and

15  as I understand it, the bankruptcy -- within the

16  bankruptcy proceeding there was an auction to

17  sell this property; is that right?

18      A.    Yes.

19            MR. RANDO:  Counsel, please clarify

20      when you say we are in bankruptcy, you're

21      referring to...

22            MR. MODABBER:  The state of the --

23      I'm just trying to fix the time.

24            MR. RANDO:  No, I understand that

25      but --

Page 60

1                          H. Vaccaro

2          Q.    Were there other offers to purchase

3    this property before the offer from El-Rich?

4          A.    I don't know.

5          Q.    Do you recall -- do you know a

6    gentleman by the name of Richard Altimare?

7          A.    That was after.  That was 2007.

8          Q.    Okay.  If you would turn in your

9    binder to Tab 58.

10         A.    Fifty-eight?

11         Q.    Yes, sir.

12         A.    Okay.  I have it.

13         Q.    And this is a Notice of Sale of

14   Estate Property and it has a court stamp of

15   December 10, 2001 in the upper right-hand

16   corner.

17               See that?

18         A.    Yes, I do.

19         Q.    Does this refresh your recollection

20   as to when the efforts were made to consummate a

21   sale of this inventory out of the bankruptcy to

22   El-Rich Corporation?

23         A.    Yes, I do.

24         Q.    All right.  Take a look, if you

25   would, at the description of the property to be

Page 61

                              H. Vaccaro

1

2   sold and I'll read it into the record.

3          "All of the estate's right, title and

4   interest in personal property stored at 534

5   Montgomery and Worldwide Moving."

6          Do you see that?

7   A.     Yes, I do.

8   Q.     Is it your understanding when this

9   notice was -- by the way, did you receive this

10  notice?

11  A.     Yes, I did.

12  Q.     And did you receive it in roughly

13  2001 as part of your involvement in the bank --

14  your, HVV's involvement in the bankruptcy?

15  A.     Yes.

16  Q.     All right.  When you saw this, did

17  you understand what specifically was being sold?

18  A.     Absolutely.

19  Q.     And is what I just read into the

20  record, this sentence, consistent with your

21  understanding?

22  A.     Yes.

23  Q.     All right.  You mentioned -- we've

24  been talking about the buyer of this property,

25  El-Rich Corporation.

1                          H. Vaccaro

2      A.      Yes.

3      Q.      Do you know Elmer Kendrick?

4      A.      Yes.

5      Q.      When did you first meet Mr. Kendrick?

6      A.      Approximately 1995.

7      Q.      Did you know in 2001 that

8  Mr. Kendrick was the incorporator of El-Rich

9  Corporation?

10     A.      Yes.

11     Q.      Is there a gentleman with the last

12  name of Bahary?

13             And I don't know if I'm

14  pronouncing --

15     A.      Yes.  That's my son-in-law, Mark

16  Bahary.

17     Q.      Okay.  Is he involved in any way with

18  El-Rich Corporation as far as you know?

19     A.      Not at all.  I know.  Not at all.

20     Q.      Has he ever been?

21     A.      Yes.  On the day of the auction

22  Mr. Kendrick was in the hospital and a doctor

23  would not give him permission to fly.

24             His other partner, Richard McCabe,

25  that's how El -- Elmer and Rich, El-Rich, was in

                            H. Vaccaro

1

2      Q.     So let me break it down.

3             Did you have conversations with

4    Mr. Kendrick about the offer El-Rich was going

5    to make before El-Rich made its offer?

6      A.     Yes.

7      Q.     What did you discuss with

8    Mr. Kendrick?

9      A.     I went to Mr. Kendrick and asked him

10   to put a bid in, because I didn't have the

11   money, on the memorabilia and if it was

12   successful, I would work a deal out with him

13   afterwards where he would get his money back,

14   plus a kicker.  And since I had business

15   dealings with him in the past, I just had to

16   shake the man's hand, was good enough for me.

17   Didn't need anything in writing.

18     Q.     Are you familiar with the company

19   Vintage Pop, Inc.?

20     A.     Yes.

21     Q.     Do you recall when that company was

22   formed?

23     A.     Not off the top of my head so I'm not

24   going to speculate.

25     Q.     That's fine.

Page 69

H. Vaccaro

1    Q.    All right.  To the best of your

2    knowledge, are the terms of this offer the terms

3    under which El-Rich actually bought the property

4    out of the bankruptcy?

5    A.    I don't know that.

6    Q.    Fair enough.

7         Did you understand when this offer

8    was being made that in order for a sale to be

9    consummated, that the bankruptcy judge would

10   have to approve any sale?

11   A.    Absolutely.

12   Q.    Okay.  And you understood that in

13   order for that sale to be approved, disclosure

14   would have to be made about all the

15   circumstances of the proposed offer and the

16   sale, and the judge after looking at it would

17   then either say yes or no?

18   A.    Yes.

19   Q.    If you would turn the page, I'm

20   sorry, to the next exhibit.  I'm at Exhibit 59.

21        (Document review.)

22   Q.    And I'm going to ask you whether

23   you've ever seen this exhibit, which is the

24   order approving of the sale to El-Rich before.

1                              H. Vaccaro

2          A.     Yes, I have.

3          Q.     Do you recall seeing it in roughly

4   January of 2002, which is the stamp that's on

5   the first page?

6          A.     Yes.  I picked it up at the

7   courthouse.

8          Q.     You did.

9                 And you notice on the second page of

10  this exhibit it has the numbers VPM 1763 on the

11  bottom right-hand corner.

12                On that page you see some handwriting

13  there?

14         A.     Yes, I do.

15         Q.     And you recognize that or understand

16  that to be the handwriting of the judge?

17         A.     Yes.

18         Q.     All right.  Can you read those --

19                MR. DURST:  Object.  That's

20  speculation by the witness.

21  BY MR. MODABBER:

22         Q.     Do you know whose handwriting that

23  is?

24         A.     I can only assume it's the judge's

25  because the judge is the only one that can write

1                          H. Vaccaro

2    on an order.

3              MR. RANDO:  I would ask the witness

4        not to assume anything.

5              MR. POULOS:  Don't assume that.

6    BY MR. MODABBER:

7        Q.    When you picked up a copy of the --

8    when you picked up the order, did it have this

9    handwriting on it?

10       A.    Yes, and I didn't put it there.

11       Q.    Okay.  If I told you that Elmer

12   Kendrick -- do you know who formed Vintage Pop,

13   Inc.?

14       A.    Yes.

15       Q.    Who was that?

16       A.    I believe it might have been my son.

17   I'm not sure.

18       Q.    You're not sure.

19             If I told you that it was

20   incorporated, at least according to records

21   we've looked at, by Elmer Kendrick, would that

22   refresh your memory as to who incorporated

23   Vintage Pop, Inc.?

24       A.    It's possible.

25       Q.    Okay.  Would you have any explanation

1                    H. Vaccaro

2    your son-in-law, is one?

3         A.    Toni is my daughter.

4         Q.    I'm sorry.  It's your

5    daughter-in-law.  Your daughter.

6         A.    My daughter.

7         Q.    Okay.  Whether she is an officer of

8    Vintage Pop, Inc.?

9         A.    She was a shareholder.  I don't know

10   if she was an officer.

11        Q.    During the course of either -- of

12   either your or the Jacksons' bankruptcies, did

13   you ever disclose the arrangements you had made

14   with Mr. Kendrick to the bankruptcy judge?

15        A.    No.

16        Q.    Do you know whether your lawyers did

17   so on your behalf?

18        A.    No.

19        Q.    Do you know whether anybody told any

20   member of the Jackson family about the deal you

21   had made with Mr. Kendrick for El-Rich to

22   purchase the property?

23        A.    I wouldn't think anybody would have.

24   It was a private business matter.

25        Q.    Did you ever tell the bankruptcy

Page 74

H. Vaccaro

2  trustee that you had reached an agreement with

3  Mr. Kendrick where El-Rich would buy the

4  property and then you would turn around and buy

5  it six months later?

6       A.    No.

7       Q.    Why not?

8       A.    Why should I?

9       Q.    Did you have a reason not to tell

10  them?

11      A.    I had no reason to tell them.

12            MR. MODABBER:  Why don't we take a

13  break now if that's all right.

14            THE VIDEOGRAPHER:  The time is 11:00.

15  We're going off the record.

16            (Recess is taken.)

17            THE VIDEOGRAPHER:  The time is 11:15.

18  We're back on the record.

19  BY MR. MODABBER:

20      Q.    Okay.  Mr. Vaccaro, before we broke

21  we were talking about whether or not you had

22  disclosed to the bankruptcy trustee or anybody

23  else in any way related to that bankruptcy or

24  involved in that bankruptcy the fact that you

25  had made an arrangement with El-Rich Corporation

1           H. Vaccaro

2    There should be a letter dated February 20, 1999

3    at the very front of your binder there,

4    Mr. Vaccaro.

5           (Document review.)

6       Q.    The first tab.

7       A.    Oh, okay.

8       Q.    There we go.  Okay.

9           So if you would, I'm going to ask you

10   to hand that document to the court reporter and

11   I'll identify it first as a February 20, 1999

12   letter from Ed Pease to the law offices of Oxman

13   & Jaroscak, J-a-r-o-s-c-a-k, addressed to

14   Mr. Oxman.

15           MR. RANDO:  Do you care if we take

16       this one?

17           MR. MODABBER:  No.

18           MR. RANDO:  He already has it.

19           MR. MODABBER:  I just want the court

20       reporter to mark it as 81.

21           THE WITNESS:  Mark this one or what

22       you have?

23           MR. MODABBER:  Let's mark yours.

24           (Plaintiffs' Exhibit 81, Letter dated

25       2/20/99 from Pease to Oxman, marked for

Page 93

1                         H. Vaccaro

2          do?

3                    MR. MODABBER:  All I want to know is

4          establish that -- I want to establish that

5          this letter was sent on behalf of this

6          client, not over his objection, with his

7          knowledge, approval, understanding by an

8          authorized agent.  In other words, it's

9          binding on Mr. Vaccaro.

10                   MR. RANDO:  So that's really all you

11         need for your record.

12                   MR. MODABBER:  For --

13                   MR. RANDO:  Do me a favor, go through

14         the questions with him and I think that

15         should be okay, unless you want to give me

16         a moment to confer with my client and maybe

17         we can just stipulate to it.  It's up to

18         you.

19                   MR. MODABBER:  Let me try it and if I

20         can't get there, we'll break.

21                   MR. RANDO:  Okay.

22         BY MR. MODABBER:

23             Q.    Did Mr. Pease write this letter in

24         his capacity as an agent; namely, a lawyer of

25         yours as far as you know?

H. Vaccaro

1

2      A.     Yes.

3      Q.     And was he authorized to write that

4  letter in his capacity as a lawyer for you or

5  HVV?

6      A.     Yes.

7      Q.     Did you have any quarrel or quibble

8  with any of the contents of this letter once you

9  saw it?

10     A.     No.

11     Q.     To your knowledge, was the

12  application made to the court by Mr. Pease to

13  assign the copyrights that may be embodied in

14  the property?

15     A.     I don't think so, because at that

16  point in time we no longer had the property.  It

17  had to be turned over to the bankruptcy trustee

18  as the family had filed bankruptcy.  That's what

19  I recall.

20     Q.     Do you recall discussing with

21  anybody, excluding your lawyers for the moment,

22  that you would like to be able to sell not just

23  the personal property and physical items that

24  you had found in the warehouse, but also, for

25  example, the copyrights in any of the physical

                    H. Vaccaro

1

2    recordings that you had found --

3         A.    No.

4         Q.    -- in order to satisfy your judgment?

5         A.    No.

6         Q.    You can take a look at the documents

7    to refresh your memory if you want, but you

8    recall the Notice of Sale and the order

9    approving the sale referring to personal

10   property being sold and only personal property?

11             In other words, there's no reference

12   to the copyrights in there.

13             MR. RANDO:  Can you be a little more

14        specific about which documents?

15        A.    I have to look at the notice.

16             MR. RANDO:  Just identify the

17        exhibit.

18             Is it in the exhibits we looked at

19        before?

20             MR. DURST:  It's Exhibit 58.

21             MR. RANDO:  In the 50s?

22             MR. MODABBER:  Exhibit 58.

23             MR. RANDO:  Okay.

24   BY MR. MODABBER:

25        Q.    I think we already covered...  I'm

H. Vaccaro

Okay.  So now where we are in the chronology is El-Rich has purchased all of the estate's right, title and interest to the personal property that was in the storage facilities, okay?

A.     Yes.

Q.     I'm going to fast-forward now about six months roughly and I'll ask you to turn the page to Exhibit 61 now to the next Bill of Sale, and I'll ask you to tell me whether or not you recognize this.

(Document review.)

A.     Okay.

Q.     Do you recognize it?

A.     Yeah.

Q.     What is that?

A.     It's a Bill of Sale between El-Rich and Vintage Pop, Inc.

Q.     And as far as you know, did Vintage Pop, Inc. purchase everything El-Rich had bought out of the bankruptcy from El-Rich?

A.     Yes.

Q.     The purchase price recited is $75,000.

                        H. Vaccaro

1

2  purchased all of this property for only $25,000.

3      A.    Yes.

4      Q.    Can you explain why $25,000, El-Rich

5  paid 25 but you're now giving us that Vintage

6  Pop, Inc. was buying it from El-Rich for 75?

7      A.    Very simple.  El-Rich had to pay the

8  storage house, the warehouse, $50,000, so 50 and

9  25 is 75.

10     Q.    Got it.

11           At the time Vintage Pop, Inc. bought

12 the property from El-Rich, to your knowledge was

13 anything missing from the property that had

14 originally been found by Mr. Kunis?

15     A.    Not to my knowledge.

16     Q.    All right.  I'm going to take a step

17 back for a minute.

18           There are a number of companies that

19 use the name or the word Vintage or Vintage Pop.

20           Could you tell us all of the

21 companies that you're aware of that use one or

22 more of those words in their name?

23     A.    The companies that my family is

24 involved with are or were Vintage Pop, Inc., and

25 that was dissolved after the sale and then we

Page 106

H. Vaccaro

1    just reconstituted and put it back in business

2    just to keep the name alive, Vintage Pop, Inc.;

3    Vintage Associates, LLC; then there's some

4    California entities that Mr. Mann has set up and

5    I don't know all of those names, but they use

6    Vintage throughout.

7        Q.    All right.  Who are the owners of

8    Vintage Associates LLC?

9        A.    Myself, my son Henry junior, my

10   son-in-law Mark Bahary, my daughter Toni Bahary

11   and Keith Lowy has a small percent.

12       Q.    What is Vintage Associates LLC's

13   business?

14       A.    Just to hold -- it was a holding

15   company just for the Michael Jackson

16   memorabilia.

17       Q.    Vintage Pop, Inc. was dissolved you

18   said.

19            Do you remember in what year?

20       A.    Right after the sale to Vintage

21   Associates.

22       Q.    Do you recall approximately what year

23   that was?

24       A.    No.  Like you said, don't guess.

1              H. Vaccaro

2       Q.    Do not guess.

3             Why don't we turn to Exhibit 62.

4             First tell me whether you've ever

5  seen this before.

6       A.    Yes.

7       Q.    What is this?

8       A.    It's the Bill of Sale from...

9             (Document review.)

10      A.    ...from yeah, Vintage Pop, Inc. to

11 Vintage Associates.

12      Q.    Does looking at this Bill of Sale

13 refresh your memory as to when Vintage Pop, Inc.

14 was dissolved?

15      A.    Yeah.  It would have been in the end

16 of '06 or '07.

17      Q.    Okay.  And what about this document

18 refreshes your memory?

19      A.    Pardon?

20      Q.    Is it a date, a signature?

21      A.    Yeah, the date on the bottom.  It

22 says, "The undersigned terms of the sale on the

23 27th of November."  So I know after it was sold,

24 my accountant said, "You don't need it anymore"

25 and we just dissolved it.

1                        H. Vaccaro

2        Q.    Was Vintage Pop, Inc. doing any

3   business between 2002 -- withdrawn.

4              Do you recognize the signatures on

5   Exhibit 62?

6        A.    Yeah.  That's my son and my name.

7        Q.    And did you both sign this document

8   on or around November 27th, 2006?

9        A.    Yes.

10       Q.    All right.  In 2004, Michael Jackson

11  sues you and a number of other companies in

12  California in Federal District Court.

13             Do you recall that?

14       A.    Definitely.

15       Q.    Can you describe for us what the

16  activities were that you were engaged in that

17  led to that lawsuit?

18       A.    Yes.

19       Q.    Please do.

20       A.    We had put up a Pay-Per-View website

21  to display photographs of all the memorabilia

22  that was seized and eventually brought back to

23  the Vaccaro warehouse in Asbury Park, and there

24  was a Pay-Per-View website, they sued to shut

25  the website down and sued me for everything

1                          H. Vaccaro

2     that.

3          A.    Yes, I have.

4          Q.    Were you engaged in that kind of

5     activity using Michael Jackson's name or

6     photograph; namely, using his name or image to

7     sell other products?

8          A.    No.   The only time it was used was to

9     promote the website.

10         Q.    You've got the complaint open, the

11    complaint in this case that brings here.

12         A.    Oh, yes.

13         Q.    I'm going to ask you to please turn

14    to page 16 of the complaint.

15              (Witness complies.)

16              MR. RANDO:   Counsel, could you just

17         identify the docket number for this just

18         for the record?

19              MR. MODABBER:   The docket number?

20              MR. RANDO:   11 CV 00584, California.

21              I know you said "this case."   It

22         would be easier.   Then you can just keep

23         saying "this case."

24    BY MR. MODABBER:

25         Q.    You on page 16?

1                       H. Vaccaro

2          A.     Yes, I am.

3          Q.     There's a couple of pictures on this

4    page in the lower part.  There's one on the

5    right and one on the left.

6                 Do you see what I'm talking about?

7          A.     Yes.

8          Q.     The one on the right I'll represent

9    to you is a logo, a business logo.

10                Have you ever seen that logo before?

11         A.     Yes.

12         Q.     When's the first time you saw it?

13         A.     Don't recall.

14         Q.     Did you have any involvement in

15   creating it?

16         A.     No.

17         Q.     Do you know who created it?

18         A.     No.

19         Q.     Do you recognize -- the first letter

20   of this logo it's VPM, right?

21         A.     Yes.

22         Q.     Can you describe how the V is put

23   together here in this logo?

24         A.     Well, it looks like it's put together

25   with a photograph of Michael Jackson leaning one

H. Vaccaro

way and then just an artist drawing another line
there to make it appear as if it is a V for
Vintage.

Q.    Okay.  And did you recognize in that
the logo that the image of the individual
leaning there is Michael Jackson?

          MR. DURST:  I'm going to object --

          MR. MODABBER:  Withdrawn.

          MR. DURST:  -- as vague as to what

     the image is, whether it's the one on the

     left or the drawing which is part of the --

          MR. MODABBER:  I'll withdraw the

     question.

BY MR. MODABBER:

Q.    Have you ever used this logo in any
of your business?

A.    No.

Q.    Did you -- were you ever asked to
approve this logo for any reason?

A.    No.

Q.    Did you ever approve the use of this
logo for any reason?

A.    I never saw it until it was on the --
I don't know whether I saw it on a letterhead or

Page 122

H. Vaccaro

2 Michael Jackson, just different from the earlier

3 one?

4 　　A.　　No.　I can't tell.　I can't tell who

5 it is.

6 　　Q.　　Okay.　But you know you've never seen

7 that logo before.

8 　　A.　　Never saw it before.

9 　　Q.　　Had you ever used the logo that I

10 showed you on page 16 of this lawsuit, CV

11 1100584 for counsel, to page --

12 　　A.　　No, I never --

13 　　Q.　　Did you ever use that logo for

14 anything you did?

15 　　A.　　I never use any logos.

16 　　Q.　　So that means you didn't use this one

17 either, right?

18 　　A.　　That's correct.

19 　　Q.　　In the 2004 lawsuit where Michael

20 Jackson sued you, do you recall that the judge

21 granted a preliminary injunc -- what's known as

22 a preliminary injunction against all of the

23 defendants in that case, correct?

24 　　A.　　Yes.

25 　　Q.　　And do you recall that you or lawyers

1                    H. Vaccaro

2  on your behalf opposed the issuance of that

3  preliminary injunction?

4       A.    I don't know.  I don't recall,

5  because back then I didn't even have the money

6  to pay for a lawyer.  I represented myself pro

7  se to at least answer so that I wouldn't be held

8  in default, and then eventually I got Mr. Pease

9  on the come to go to court and we won something.

10 I don't know what the hell we won at the time to

11 be honest with you.  I just don't.

12      Q.    But you do know that the judge

13 ordered you to stop the activities that were on

14 your website.

15      A.    Yes, absolutely, and we stopped.

16      Q.    Okay.  Did you know that in order for

17 the judge to issue directions that you stop that

18 activity, that Michael Jackson had to establish

19 that he was likely to win in his lawsuit against

20 you?

21           MR. DURST:  Objection.  Calls for a

22      legal conclusion.  Calls for speculation.

23           MR. MODABBER:  I'm asking whether he

24      knows.

25           MR. RANDO:  I'll echo that objection.

1               H. Vaccaro

2          Witness can answer.

3     A.    But I do know and I'm glad you raised

4  the question, because a TRO was based on a

5  fraudulent affidavit from a lawyer that I didn't

6  know was fraudulent at the time.  So it was

7  granted on misrepresentation by a lawyer by the

8  name of Michelman.

9     Q.    Can you answer my question?

10    A.    I'm answering your question.

11         MR. RANDO:  Can we read back the

12  question, please?

13         (Question was read back as follows:

14         "QUESTION:  Did you know that in

15    order for the judge to issue directions

16    that you stop that activity, that Michael

17    Jackson had to establish that he was likely

18    to win in his lawsuit against you?")

19         MR. RANDO:  Same objection.

20         The witness can respond.

21    A.    Okay.  The answer is yes, but it's

22  predicated on the information that the judge has

23  in front of him or her and if it's fraudulent

24  information that no one is aware of, which it

25  was in this case, the judge granted the order

1                          H. Vaccaro

2    Mr. Kendrick off and we wanted to deal with a

3    different entity, so the new entity was Vintage

4    Associates, which paid Mr. Kendrick $100,000,

5    he's out of the picture, now I stepped in

6    because I paid him off as an owner of Vintage

7    Associates LLC.

8         Q.    All right.  Let me find the exhibit,

9    but before I turn to the exhibit, was the only

10   reason, at least at the time you formed Vintage

11   Associates LLC, was the only reason you formed

12   it to acquire the assets that at that time were

13   owned by Vintage Pop, Inc.?

14        A.    Yes, plus we were now going to enter

15   into a new agreement to sell everything to this

16   Richard Altimare.

17        Q.    All right.  If you turn to

18   Exhibit 62, that's the Bill of Sale, excuse me,

19   from Vintage Pop, Inc. to Vintage Associates

20   LLC.

21        A.    Which exhibit?

22        Q.    Sixty-two.

23             You recognize this as the Bill of

24   Sale where Vintage Associates bought Vintage

25   Pop, Inc.'s assets, right?

1                      H. Vaccaro

2      A.    Yes.

3      Q.    There's $100,000 that was paid by

4  Vintage Associates for this property.

5            Do you see that?

6      A.    Yes.

7      Q.    Was that in fact the amount of money

8  that was paid to Vintage Pop, Inc.?

9      A.    Eventually it went to -- I don't know

10  whether it went to Vintage Pop, Inc. or it went

11  directly to Elmer Kendrick to buy his share, but

12  it was paid.

13      Q.    Whose money was the $100,000?

14      A.    It was mine from the sale of my

15  house.

16      Q.    And I think you told us earlier that

17  after this sale, you dissolved Vintage Pop, Inc.

18  because all it had was ownership of these

19  assets.

20      A.    I believe so.

21      Q.    All right.  And I'm sorry if I asked

22  you this before, but who were the owners of

23  Vintage Associates LLC when it purchased Vintage

24  Pop, Inc.'s assets?

25      A.    Myself, my son Henry junior, my

1                         H. Vaccaro

2      son-in-law Mark Bahary and my daughter Toni

3      Bahary.

4                   Keith came in later on.

5           Q.    How long -- how much later did Keith

6      Lowy, L-o-w-y?

7           A.    L-o-w-y, Lowy.

8           Q.    How much later did he come in?

9           A.    I'm guessing about a year-and-a-half

10     ago so...

11                MR. DURST:  Don't guess.

12          A.    If you do the math.

13                MR. DURST:  Object.  I don't want him

14     to guess.

15                THE WITNESS:  Okay.

16     BY MR. MODABBER:

17          Q.    Approximately.

18          A.    Approximately a year-and-a-half ago.

19          Q.    So we're in 2010, 2011.  Somewhere in

20     there.

21          A.    I believe so.

22          Q.    And did you know Mr. Lowy before he

23     became involved with Vintage Associates?

24          A.    He's my nephew.

25          Q.    Ah.

H. Vaccaro

2        Did he have any particular job duties

3 as one of the, as a new owner of Vintage

4 Associates LLC?

5      A.     None whatsoever.

6      Q.     Who runs today Vintage Associates

7 LLC?

8      A.     I do.

9      Q.     For all of the other owners, do any

10 of them perform any services or work for, like

11 day-to-day work for Vintage Associates LLC?

12      A.     The answer is nobody does day-to-day

13 work because there's nothing to do.  It's just a

14 file in our office.

15      Q.     When did you meet Howard Mann?

16      A.     I have to refresh my memory by

17 looking at a document.

18      Q.     Take your time.

19      A.     It will give me the date.

20      (Document review.)

21      A.     It's not there.  I'm looking for a

22 production agreement that I signed with Howard

23 Mann.  That's the first agreement I ever had

24 with him and I met him about a week before that

25 agreement, so if you have it --

1          H. Vaccaro

2          MR. MODABBER:   You guys want to take

3     a look?

4          It's copied a little different, but

5     it looks to me the same.

6          MR. RANDO:   Sure.

7          (Handing.)

8          (Document review.)

9          MR. MODABBER:   So can we stipulate

10    that what the witness has brought and going

11    to produce for us today is a Production and

12    Distribution Agreement, a copy of which has

13    already been marked as Exhibit 64?

14         MR. RANDO:   Yes.

15         MR. MODABBER:   All right.

16    BY MR. MODABBER:

17         Q.   So Exhibit 64 refreshes your memory

18    about approximately when you first met Howard

19    Mann.

20         A.   Yes, about a week or two before this

21    date, so it's the first week or so or second

22    week of September 2009.

23         Q.   All right.  Up until the time you met

24    Howard Mann in 2009, had you done anything else

25    to in any way commercially exploit the property

1                        H. Vaccaro

2    that Mr. Kunis originally found and that Vintage

3    Associates now came to own?

4              MR. DURST:  Objection.  Vague and

5         ambiguous.

6         A.    The only thing I did was to try to

7    sell it.  I wanted to sell it, get paid and kiss

8    the whole mess goodbye.

9         Q.    And this is -- let me back up.

10   There's one other thing, and that is the

11   Pay-Per-View website that you put up that was

12   the subject of a lawsuit.

13             That's one thing you tried to do,

14   correct?

15        A.    Correct.

16        Q.    And then all of your other activities

17   with respect to this property have been limited

18   to trying to sell the whole lot?

19        A.    Yes.

20             MR. RANDO:  Counsel, can we just try

21        to pinpoint a time frame that we're

22        referring to with that question?

23             MR. MODABBER:  I'm talking about ever

24        since he owned it.

25             MR. RANDO:  Okay.  To what point in

1                    H. Vaccaro

2       time?  The time he meets Mr. Mann?

3             MR. MODABBER:  Yes, until he meets

4       Mr. Mann.

5       A.     The only thing I tried to do other

6       than the website was to sell it.

7       Q.    You never made copies of recordings

8       and tried to sell those, correct?

9       A.     No.

10      Q.     You never put any of the recordings

11      up on the web for people to download --

12      A.     No.

13      Q.     -- correct?  Is my statement correct?

14      A.     That's correct, I did not.

15      Q.     Other than T-shirts with Michael

16      Jackson's photo on it, did you ever use his

17      photo or name and put it on any other products

18      and try to sell those?

19      A.     No.

20      Q.     Okay.  Tell me the circumstances

21      under which you first met Howard Mann.

22      A.     Okay.  At this time frame I had hired

23      a -- I'm trying to think of the correct -- an

24      agent in New York to try and sell my memorabilia

25      collection as I was having trouble.  I mean

Page 238

H. Vaccaro

2  the IRS on the side and I talked to their head

3  attorney, and I says, "You're going to defend

4  him."

5        So they agreed to defend me and they

6  won a case.

7     Q.    Under the Structured Management

8  Agreement, Exhibit 57, you explained that you

9  were licensing the rights to exploit the

10 memorabilia and recordings.

11       We'll call it The Jackson Collection,

12 all right?

13    A.    Yes.

14    Q.    What specifically is your

15 understanding of what was licensed?

16    A.    Everything that was owned by Vintage,

17 the new entity in California had the right to

18 exploit.

19    Q.    And that include -- did that include

20 copyrights in sound recordings that were on

21 these tapes?

22    A.    Correct.

23    Q.    By the way, did you think you also

24 owned the copyrights in the compositions; in

25 other words, the songs as opposed to the -- that

1                     H. Vaccaro

2    were on the recordings?

3              MR. RANDO:  I will object on the

4         basis of seeks legal conclusion.

5              But the witness may answer.

6         A.    No.  We knew that we had clearance

7    for those.

8         Q.    Was it your intention to get

9    clearance only from the -- on the composition

10   side, but not on the recording side; is that

11   right?

12             Let me rephrase it.

13             When you went set about to try to

14   exploit these things with Mr. Mann or license

15   them to Mr. Mann, was it your intent that you

16   obtain licenses from any of the composers who

17   had written any of the songs on the recordings?

18        A.    The answer would have been yes.

19        Q.    All right.  And was it your intent to

20   obtain permission from any of the artists

21   performing on those recordings?

22        A.    I believe that answer will be yes as

23   well, but I'm not sure.  You know, I'm not into

24   that, and if you're talking about bulldozers and

25   cranes, I know about them, okay?

1                    H. Vaccaro

2         So I just know that we had to get

3    clearances to do certain things and I know

4    Mr. Mann was prepared to get those clearances,

5    because I was -- I attended a meeting with him

6    way in the beginning when he was talking to an

7    attorney that was going to get those clearances.

8         Q.    Do you know the name of that

9    attorney?

10        A.    Hold on.  I can find out for you

11   because I have it someplace.

12        Q.    Well, if it comes to you while we're

13   in the deposition --

14        A.    Absolutely.

15        Q.    -- please share it with me.

16        Did you have any understanding that

17   you were going to try -- was it your intent to

18   obtain any clearances from the Michael Jackson

19   estate in connection with exploiting any of the

20   recordings?

21        MR. RANDO:  I'll renew my objection

22   based on a legal conclusion.

23        The witness can respond.

24        A.    I don't know what clearances were

25   needed to be honest with you, and I know they

1                        H. Vaccaro

2     went to an attorney to talk about getting

3     copyright clearance or writer's clearance.  I'm

4     not versed in that.  Believe me, I'm not.

5          Q.    Is it fair to say you left that in

6     Mr. Mann's hands or somebody else's?

7          A.    With Mr. Mann.

8          Q.    All right.

9          A.    And with the attorney that he was

10    going to hire.  He never hired the attorney

11    because he claimed he wanted too much money.

12         Q.    Does a law firm named Sheppard Mullin

13    ring a bell at all?

14         A.    No.  I never heard of that firm.

15         Q.    Okay.

16         A.    This was a single practitioner.  I

17    know that much.

18         Q.    Okay.  I'm on Bates numbered page 4

19    of Exhibit 57, the Structured Management

20    Agreement.

21         A.    Exhibit 57, page 4.

22         Q.    Page 4.

23               And the paragraph numbered two --

24    sorry.

25         A.    Okay.

1              H. Vaccaro

2        Q.    It says, "Mann and Vintage agree that

3   they will form a California corporation to be

4   named Vintage Pop, Inc."

5              Do you know whether a California

6   corporation named Vintage Pop, Inc. was ever

7   formed?

8        A.    I have no idea.

9        Q.    How involved did you plan on being at

10  the time you signed Exhibit 57 in Mr. Mann's

11  activities in exploiting The Jackson Collection?

12       A.    A lot more involved than I ended up

13  being.

14       Q.    So you wanted to be -- how involved

15  did you want to be?

16       A.    Well, they were going to set up a

17  board of directors.  I was supposed to be

18  chairman of the board.  I was supposed to be

19  involved in the decision-making.  None of that

20  ever happened so I don't even know what was set

21  up in California.

22       Q.    Okay.  Did you know what business

23  activities Mr. Mann was going to engage in with

24  respect to exploiting this Jackson collection?

25       A.    What he told me.

1                          H. Vaccaro

2          Q.     What did he tell you?

3          A.     No, I only knew what deals that he

4    was -- that he told me about.

5                 I don't know if those deals he didn't

6    tell me about.

7          Q.     Okay.  Tell me the ones he did tell

8    you about.

9          A.     There's a long list of them.

10                Going to do a book with Mrs. Jackson.

11   He's going to use the photography that Vintage

12   owned, number one.

13                He was going to do a movie with

14   Mrs. Jackson.

15                He was going to do a documentary

16   about the estate.

17         Q.     About Michael Jackson's estate?

18         A.     Yes.

19                He was going to raise money.  I must

20   have ten different documents where he's going to

21   raise money where none of them ever

22   materialized.

23                He was going to sell books overseas

24   and that's going to bring a lot of money in.

25                He was going to exploit the music in

1                         H. Vaccaro

2      China and Japan.   That never materialized.

3                    And on and on, and on and on.

4          Q.     Were you involved in any way of the

5      book Never Can Say Goodbye?

6          A.     Not at all.

7          Q.     Were you involved in any of the

8      efforts to raise money that Mr. Mann was sharing

9      with you?

10         A.     Only in one instance when he wanted

11     to see if I could help raise money for the movie

12     he was going to do about the Michael Jackson

13     estate on the two phone calls.

14         Q.     Did they lead to anything?

15         A.     No.

16         Q.     Did you do anything in connection

17     with any movie about Mrs. Jackson?

18         A.     No.

19         Q.     Do you know whether anybody said

20     anything in furtherance of a movie about

21     Mrs. Jackson?

22         A.     No.

23         Q.     And by anybody, I mean Howard Mann or

24     people working with him.

25         A.     I don't know.

1                          H. Vaccaro

2    involvement in trying to bring people to Howard

3    with deals to help exploit and bring money to

4    the project.

5         Q.    One of the things that was done after

6    the Structured Management Agreement was signed

7    by Mr. Mann was the creation of a website that

8    prompted the filing of the lawsuit that brings

9    us here today, okay?  The name of that lawsuit,

10   or I'm sorry, the name of that website is

11   michaeljacksonsecretvault.com or

12   jacksonsecretvault.com.

13        A.    Okay.

14        Q.    Have you ever seen that website

15   before?

16        A.    Yes.

17        Q.    And if you would take a look at, it's

18   the complaint in this action and it's

19   Exhibit 68.

20        A.    Sixty-eight?

21        Q.    Sixty-eight.

22              (Document review.)

23        A.    Okay.

24        Q.    All right.  And there's some tabs on

25   the bottom that are exhibits to the complaint.

1                       H. Vaccaro

2  I want to ask you to take a look at Tab A first.

3       A.    About how far, how many pages back is

4  that?

5       Q.    There should be tabs on the bottom.

6       A.    Oh, I see.  Okay.  I got it.

7       Q.    Exhibit A.

8       A.    Um-hmm.

9       Q.    It's about page 35.

10      A.    Okay.

11            MR. RANDO:  We don't have the pretty

12  color one though.

13            MR. MODABBER:  Okay.

14  BY MR. MODABBER:

15      Q.    Do you recognize this as the home

16  page for that website?

17      A.    Yes.

18      Q.    All right.  Did you have any

19  involvement in any way in creating this website,

20  Michael Jackson Secret Vault or

21  jacksonsecretvault.com?

22      A.    None whatsoever.

23      Q.    When's the first time that you knew

24  that it had been created?

25      A.    When Howard called up and said the

                            H. Vaccaro

1

2    website is up and running.

3         Q.     Did you have any input into any of

4    the content of this website?

5         A.     None whatsoever.

6         Q.     Exhibit B, if you would turn to

7    that --

8         A.     Okay.

9         Q.     -- is another page of the website and

10   it has in the middle of it, I'll describe it as

11   an advertisement for an event called The

12   Unveiling of the Jackson Secret Vault

13   Lithographic Collection.

14        A.     Okay.

15        Q.     Did you hear about that event?

16        A.     Yes.

17        Q.     You heard about it?

18        A.     Yes.

19        Q.     When did you hear about it?

20        A.     Oh, a week before it was going to

21   happen.

22        Q.     Whose idea was the event --

23        A.     Howard's.

24        Q.     Try and let me finish.

25        A.     Okay.

1                          H. Vaccaro

2        Q.    Did you approve of all the things he

3   was doing, the ones you knew about?

4        A.    I had no problem with it because they

5   were supposed to raise money to bring money into

6   the entity, which we're the beneficiary of, and

7   they all looked like great deals on paper.

8        Q.    Do you know a gentleman by the name

9   of Rob Creel?

10       A.    No.

11       Q.    Have you ever heard that name before?

12       A.    I'm not sure.

13       Q.    In your mind, what's the current

14   status of the parties' rights under the

15   Structured Management Agreement?

16       A.    He's in default.

17       Q.    Have you done anything -- withdrawn.

18             Have you ever sent him a formal

19   notice that he's in default?

20       A.    No.

21       Q.    Have you ever told him in person that

22   he's in default?

23       A.    No.

24       Q.    Have you ever told anybody you

25   understood to be representing Mr. Mann that you

1                       H. Vaccaro

2    which you are a 51 percent owner?

3         A.    I have no idea.

4         Q.    Turn to Tab 63 in your binder if you

5    would.

6         A.    Sixty-three?

7         Q.    Yes, sir.

8               (Witness complies.)

9         A.    Okay.

10        Q.    Do you recognize Exhibit 63?

11        A.    I do.

12        Q.    What is it?

13        A.    It says "Purchase Agreement."

14        Q.    Turn to the last page where there are

15   a bunch of signatures --

16        A.    Yes.

17        Q.    -- and tell me whether you recognize

18   any of the signatures on that page.

19        A.    Yes.  I recognize mine and my son's.

20        Q.    Okay.  Did you sign twice on the

21   lower right-hand portion?

22        A.    I did.

23        Q.    All right.  And is it your son's

24   signature twice on the lower left-hand portion?

25        A.    Yes, it is.

                              H. Vaccaro

1

2       Q.    Were you present -- did you sign it

3   on or about December 19, 2009?

4       A.    Yes.

5       Q.    And this is now roughly 30 days after

6   the Structured Management Agreement, give or

7   take?

8       A.    Yes.

9       Q.    Can you describe your understanding

10  of the purpose of this Purchase Agreement?

11      A.    Absolutely.  This is not a real

12  agreement.

13      Q.    Tell me what you mean by that,

14  please.

15      A.    Okay.  Howard called up and at the

16  time the IRS was pressing us, and he said,

17  "Look, you gotta --

18      Q.    Let me stop you there.

19            Who's the "us"?

20      A.    Howard Mann.  They were pressing him

21  because I told them of the Structured Management

22  Agreement, and they were pressing me as well for

23  money.

24            So he said, "Let's prepare an

25  agreement that I'm purchasing everything.  That

1                          H. Vaccaro

2      way I can work something out to pay them over

3      time, and besides, I need this to show

4      Mrs. Jackson because the only way I can be

5      involved with her is if I own everything because

6      she wants nothing to do with you because you

7      seized her property."  This is not a real

8      agreement.

9          Q.    A lot going in that answer.  You're

10     going to have to give me a minute to read it.

11             (Counsel reviewing LiveNote.)

12         Q.    So as I understand it, there are two

13     purposes for this agreement being signed by you

14     and Mr. Mann.

15             The first one relates to an effort to

16     delay or stave off the IRS from its collection

17     efforts on a tax lien against you; is that

18     right?

19         A.    That's correct, because Mr. Mann told

20     me that he had an attorney that was going to

21     contact the IRS and work out a payout plan, and

22     it's better that it works through him.  That was

23     one.

24         Q.    And the other purpose for this

25     agreement was Mr. Mann was trying to do business

1          H. Vaccaro

2    with Katherine Jackson --

3          A.    That's correct.

4          Q.    -- and according to Mr. Mann,

5    Katherine Jackson would not do business with him

6    relating to this Jackson collection unless he,

7    Mr. Mann, owned it all; is that right?

8          A.    No.  As long as Henry Vaccaro was

9    involved, she wanted nothing to do with it.

10         Q.    Okay.  So it didn't have to

11   necessarily belong to Howard Mann, it just

12   couldn't belong to you.

13         A.    Right.

14         Q.    When did Mr. Mann first propose this

15   to you?

16         A.    About two days before he prepared the

17   agreement and we signed it.

18         Q.    Did -- and is what you're telling me

19   that neither of you had the intention of

20   actually performing under this Purchase

21   Agreement, Exhibit 63?

22         A.    That's correct.  No payments were

23   ever made under it.

24         Q.    To your knowledge, did it have any

25   bearing or effect on the Structured Management

1                      H. Vaccaro

2    Agreement?

3        A.    No.   The Structured Management was

4    the controlling document.

5        Q.    All right.  And did you have that

6    specific discussion with Mr. Mann?

7        A.    Absolutely.

8        Q.    When did you have that discussion?

9        A.    When we signed this.

10        Q.    Did you sign it together in person?

11        A.    No.   He was in California and I was

12    in New Jersey.

13        Q.    Okay.  Let's slow down here because

14    we're starting to talk over each other a little

15    bit.

16        A.    Okay.

17        Q.    Whose idea was it first to put

18    together this Purchase Agreement for the reasons

19    you've described?

20        A.    Howard Mann.

21        Q.    Was this something that at least to

22    you came out of the blue?

23        A.    Out of the blue.

24        Q.    And as I understand, he made this

25    proposal to you only a few days before the date

H. Vaccaro

1

2  of this agreement, December 19th, 2009; is that

3  right?

4       A.     That's correct.

5       Q.     And did he make this proposal to you

6  over the phone or in person?

7       A.     No, on the phone.  I haven't seen

8  Howard -- I've only seen him once in two years.

9       Q.     When he made this proposal over the

10 phone, was there anybody else on the call?

11      A.     My son.  We had a -- in my office I

12 have a little desk with a speakerphone, and my

13 son was on it and I was on it.

14      Q.     What did you say in response to

15 Mr. Mann's proposal to create this Exhibit 63?

16      A.     Well, first of all, I really trusted

17 the guy and he said, "This is the only way that

18 we can start making some money out here and it's

19 going to keep the IRS off our back."

20      Q.     What did you say in response to

21 Mr. Mann when he proposed this Purchase

22 Agreement, Exhibit 63, to you?

23      A.     I said, "Okay.  We'll sign it."

24      Q.     Did you have any concerns that this

25 might not be Kosher with the IRS?

1                           H. Vaccaro

2    version you got?

3         A.    I believe so.

4         Q.    Did you have any concern about what

5    Mrs. Jackson might think if she found out that

6    you actually were still the owner of the Jackson

7    collection despite Mr. Mann showing Exhibit 63

8    to her?

9         A.    Well, the only concern I had, I felt

10   that she wouldn't cooperate with what Howard was

11   trying to do out in California.

12        Q.    Unless you signed Exhibit 63.

13        A.    Yes.

14        Q.    Did Mr. Mann tell you that he had in

15   fact shown Exhibit 63 to Mrs. Jackson?

16        A.    I have no idea.

17        Q.    Did he tell you that he was going to

18   show it to her?

19        A.    He said he needed it to show her.

20              Whether he showed it to her or not, I

21   don't know.

22        Q.    Let me go back and clean up a few

23   random things, so I'm going to jump around here

24   a bit.

25              Where did the relationship or your

H. Vaccaro

1

2    or emailed my office saying that Howard owed him

3    $150,000 or some ridiculous money and unless he

4    gets his money, he's not going to be involved in

5    a project.

6          So I called Howard Mann and Howard

7    said "He's..."  I'm trying to think of the exact

8    language he used.  "He's trying to shake us down

9    and extort money from me, and all he did was

10   make a call" and bah, bah, bah, bah, bah.

11         So I says, "Howard, you're running

12   the company, do what you want to do," and so I

13   left.

14        Q.    Is it fair to say that once you

15   signed the Structured Management Agreement, you

16   handed the reigns over to Howard Mann in terms

17   of exploiting the Jackson collection?

18        A.    Absolutely.

19        Q.    And is it also fair to say that while

20   Mr. Mann was in charge of exploit --

21   commercially exploiting the assets, you or

22   Vintage Associates LLC retained ownership of the

23   Jackson collection?

24        A.    At all times, and not only the

25   ownership, the possession of the property.  It

1                    H. Vaccaro

2  reaching too far and I don't recall exactly what

3  they were.  An umbrella comes out to mind right

4  now.  I mean who the hell wants a Michael

5  Jackson umbrella.

6           MR. RANDO:  It depends on which

7       umbrella you're talking about.

8       A.    Maybe we'll put it on a bulldozer.  I

9  don't know.

10       Q.    Other than -- well, let me ask you.

11           Did you ever consult a lawyer to find

12  out whether or not your view of what merchandise

13  you could sell and not sell was correct?

14       A.    No.

15       Q.    Is it fair to say that you simply

16  relied on Mr. Mann once the Structured

17  Management Agreement had been signed?

18       A.    Yes, because he had, he told me, that

19  he had this copyright attorney or IP attorney

20  that was a professor at Harvard that was a close

21  friend of his, and he's the one that gave us

22  this opinion and everything that you can do what

23  you want to do with it.

24       Q.    Do you remember that lawyer's name?

25       A.    No.  I'm talking -- I haven't talked

1             H. Vaccaro

2    I made corrections and sent it back.  We had

3    nothing to do with the work product itself.

4         Q.    I'll represent to you that at one

5    point on the website, Michael Jackson's Secret

6    Vault website where they were selling the book,

7    there was a statement that as of July 1, 2010,

8    25,000 copies of the book had been sold in less

9    than 48 hours.

10             Have you ever heard that before?

11        A.    I saw it on the website.

12        Q.    Do you know whether it's true?

13        A.    I don't think it was true.  If it

14   was, I would have seen some money.

15        Q.    Did you ever ask anybody whether it

16   was true?

17        A.    Yes.

18        Q.    Who did you ask?

19        A.    Howard.

20        Q.    What did he tell you?

21        A.    He said it was all for hype.

22        Q.    Meaning it was not true?

23        A.    Not true.

24        Q.    Did he tell you in fact how many were

25   sold?

1                         H. Vaccaro

2        A.      He did, but I don't recall how many.

3        Q.      Was it anywhere close to 25,000?

4        A.      Absolutely not.

5        Q.      All right.  Do you know a gentleman

6    by the name of Marc Schaffel?  M-a-r-c

7    S-c-h-a-f-f-e-l.

8        A.      No.  I know the name.  I don't know

9    him.

10       Q.      When say you know the name, it's just

11   that you've heard the name or do you know

12   anything more about him?

13       A.      No, I've heard the name.

14       Q.      Do you remember how you heard it?

15       A.      Through Howard.

16       Q.      What did he tell you about

17   Mr. Schaffel, if anything?

18       A.      He told me that he bought either a

19   collection from him or he's buying some footage

20   from him that he had of Michael Jackson, and

21   we're going to use it in either one of the

22   documentaries or we're going to use it to

23   produce some video.

24       Q.      So Howard Mann had bought these

25   videos from Mark Schaffel?  Is that what you're

1            H. Vaccaro

2            "QUESTION:  Did you ever discuss with

3       Mr. Mann or anybody else associated with

4       any of the Vintage Pop entities, the fact

5       that the estate was asking for someone to

6       identify any copyrights in music that they

7       were attempting to exploit?")

8            MR. RANDO:  Other than discussions

9       with counsel?

10           MR. MODABBER:  Yes.

11      A.    No.

12      Q.    Did you ever hear that the estate was

13      objecting to the logo of Vintage Pop Media Group

14      that it included the Smooth Criminal lean in its

15      V?

16      A.    I heard that, yes, and his response

17      was that how can they have a copyright on

18      something that is public domain, and he said

19      that lean was Charlie Chaplin's lean, it could

20      be anybody's lean.

21           MR. DURST:  Fred Astaire's.

22           MR. MODABBER:  Was that you,

23      Mr. Durst?

24           MR. DURST:  Yes.

25           MR. MODABBER:  That's the second